# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **GEORGE MOORE**, individually and on behalf of a class of all persons and entities similarly situated,<br>*Plaintiffs*,<br>v.<br>**C&N CONSTRUCTION, INC.**<br>*Defendant*. | Case No. 1:25-cv-04568<br><br>Presiding: **Hon. Andrea Wood** |

## EXPERT DECLARATION OF AARON WOOLFSON

I, Aaron Woolfson, state and declare as follows:

1. I have been retained by Plaintiff's counsel to provide structure to, and then analyze, the electronic Call Detail Records ("CDR" or "CDRs"), customer lists, and other associated information that has been, or will be, provided in this lawsuit reflecting the calling done by C&N Construction, Inc. ("C&N Construction" or "C&N" or "Defendant").

2. More specifically, I have been asked to opine whether there is a reliable method to identify which calls in CDR reports maintained by Defendant's dialing platform vendor were (a) made to telephone numbers that had been on the national Do-Not-Call ("DNC") list for more than thirty (30) days and to which there were two (2) or more calls placed to that number within 365 days.

3. As described in this declaration, it is my conclusion that using call records produced in this matter there is a reliable method to identify the following: (a) calls to numbers that were on the national DNC list for more than thirty (30) days, and there were two (2) or more calls to that number within 365 days.

4. I was not retained in this matter to determine the legal standards of any court decisions or their applicability to this case, and I was not involved in the sampling or selection of



EXHIBIT B

data provided by the Defendants. This report reflects the results of my study of the underlying facts, independent analysis of the data and documents provided by Motive to counsel for Plaintiff, and third parties. My rate is $440.00 per hour for expert engagements, and $675.00 per hour for depositions, trial, and arbitration appearances.

5. I am personally familiar with the matters that are contained within this declaration, and if called to testify, I can accurately and competently testify as to them.

**Qualifications and Expert Engagements.**

6. I have over 25 years of experience in developing and analyzing databases and telephone systems and establishing the interfaces between telephone systems and the networks that convey calls. I have implemented call recording and call data collection and retention systems for commercial, government, aerospace, telecommunications, and payroll industries. My professional experience includes serving as an expert witness in cases where I evaluated the technical aspects of telephone systems, including whether they had a random or sequential number generator.

7. My qualifications and curriculum vitae are attached to this expert report as Exhibit 1. A list of the other cases in which I have testified as an expert at trial or by deposition during the previous four years is attached as Exhibit 2. I have been qualified by both Federal and State courts.[1] My testimony has been relied upon by courts in both individual and class actions,[2] by plaintiffs and defendants. My opinions have also been relied upon in arbitrations, including those involving TCPA claims.

8. I was the developer of the automated Verification of Deposit ("VOD") and Verification of Mortgage ("VOM") system that was used by Chase, Wells Fargo, Bank of

---

[1] *ABM Industries Overtime Cases* (Case No. JCCP 4502, San Francisco Superior Court) (2017) 19 Cal. App. 5th 277, footnote 5, at page 8, ("[T]here was evidence in the record that Woolfson had previously qualified as an expert in both state and federal court ...") (*ABM Industries Overtime Cases*, A132387, A133077, A133695, 19 Cal. App. 5th 277 (Dec. 11, 2017; pub. ord. Jan. 10, 2018)). (Exhibit 3).

[2] "The Court notes that Mr. Woolfson's expert report appears to include information related to the merits of the case in addition to class certification issues." *Gaines v. Law Office of Patenaude & Felix, A.P.C.*, Case No. 3:13-cv-01556-JLS-DHB (S.D. Cal.), Sep. 21, 2015, ECF 132, at 3.

America, as well as some regional banks and mortgage lenders, to facilitate the review of mortgage applications by call center staff. These systems required a great deal of integration between the telephone systems and the financial institution's computer systems, and relied heavily on my deep understanding of database and timekeeping integration technologies. It also required me to build interfaces to the ACH[3] exchanges, and with Global Payments and other large automated electronic inter-exchanges of financial information. Other processes necessitated integrating fax and OCR[4] capabilities as well as enhanced call routing – inbound and outbound – including predictive elements of enhanced call processing, and the precise timings of these events.

9. I am the inventor of "Canvas", a programming language that I developed for interfacing between telephone systems and telephone networks, capable of processing hundreds of thousands of calls a day. To date, hundreds of millions of calls have been handled by Canvas on behalf of call centers, financial institutions, conference calling companies, and organizations offering Interactive Voice Response ("IVR") services.[5]

10. I have developed highly available, upwardly scalable databases for use in the telecommunications industry. The databases and telephone systems that I have personally developed and/or coded are used by telephone companies and call centers throughout the United States and Canada to catalogue and index various customer-calling activities. Some of the companies that have used my databases and/or telephone equipment (which I personally created and manufactured) have included Japan Telecom, Experian, Bank of America, Wells Fargo Bank, JP Morgan, Bank of the West, Cogent Communications, Zone Telecom (ANPI), Aion Networks,

---

[3] Automated Clearing House ("ACH").

[4] The OCR ("Optical Character Recognition") process as integrated into the automatic monitoring of telephone calls in real time to determine whether the call was a voice or fax call, and if a fax call, decoding the contents of each fax-page into machine readable text *while* a fax was being transmitted to the bank's computers for integration with a database.

[5] IVR is a technology that allows a computer to interact with humans through the use of voice and/or DTMF tones inputted via a telephone keypad. DTMF ("Dual Tone Multi Frequency") is the signal you generate when you press a telephone's touch keys.

Smartcall Conferencing, and First National Collection Bureau, Inc., and the United States government, including the Department of Justice.

11. Through my hands-on work experience in developing databases and telephone systems, I have become very familiar with the technology related to telephone systems and their interfaces with the networks through which calls are processed, received, and transmitted. I am also familiar with how dialing systems work, and how telephone systems handle inbound and outbound calls.

12. I have been responsible for the design and development of specialized hardware and software systems that are highly dependent upon the capabilities of the computers upon which they run, and are in use at mission-critical applications, including Patriot Missile (SAIC, Patriot RTOS), Air Traffic Control Systems (Kongsberg Geospatial Corporation), and Point Lepreau Nuclear Generating Station, New Brunswick, Canada (Energié NB).

13. I held a Certificate of Public Convenience and Necessity[6] ("CPCN") – a special license and compliance certification granted to companies that provide essential public services, such as telephone corporations. The California Public Utilities Commission granted my most recent CPCN on July 18, 2017. This was a re-issue of my initial CPCN granted to TelSwitch, Inc. on June 10, 1994, which I held for approximately eighteen (18) years before taking a hiatus from providing public telephone services. The license originally granted to me in 1994 allowed me to interconnect the equipment that I designed, built and programmed, with the phone network for the purpose of providing wholesale and retail telecommunications services.

14. I have also been qualified as an expert in matters involving the TCPA and have previously been engaged on behalf of defendants and plaintiffs to analyze records of calls and, among other things, compare call records for their inclusion on the national DNC list.

15. For example, in *Wright v. eXp Realty, LLC*, No. 6:18-cv-01851-PGB-EJK (M.D. Fla.), I was engaged on behalf of defendant eXp to analyze call records and, among other things,

---

[6] Certificate of Convenience and Necessity U-5410-C granted to TelSwitch, Inc. on 06-10-1994 (Decision 94-06-022). Reissued as U-7327-C on 07-18-2017 (Decision 17-07-009).

compare them against records of leads from various sources, and to identify which numbers were authoritatively associated with telephone companies on the dates that the calls were made.

**Expertise Specifically Related to Database Work.**

16. I was relied upon as an expert witness in the case of *Hines v. KFC*, filed in the United States District Court, Southern District of California (Case No. 09cv2422 JM (POR)). In *Hines*, the court granted plaintiff's motion for class certification and certified plaintiff's meal period and rest break claims based on my analysis after finding that I am an "expert in the compilation and analysis of databases …."

17. I was expert for the plaintiffs in *Albert H. Cicairos, Frank A. Daniel, Richard Wheeler and George Thompson v Summit Logistics, Inc.* and *Kenneth Bluford v Safeway Stores, Inc.* (Case No. CV014837 [Consolidated with Case No. CV028541] Superior Court of California, County of San Joaquin).

18. In addition, I served as an expert in the *ABM Industries Overtime Cases* (Case No. JCCP 4502, San Francisco Superior Court). Relying upon my expert finding, the Appellate Court reversed the trial court's ruling and certified the plaintiffs' proposed wage and hour classes. The court noted that there was sufficient evidence contained within my expert report to support certification of the classes and subclasses, and that my experience was sufficient to allow my expert report to be admitted as evidence for that purpose. (Exhibit 3).

19. I was also expert in *Beatriz Aldapa And Elmer Avalos v. Fowler Packing Company, Inc., Ag Force, LLC, Fowler Marketing International LLC,* (Case No. 1:15-CV-00420-DAD-SAB ED, Ca.), where the employer used Datatech to maintain an accounting of piece-work and non-piece-work hours worked by agricultural workers. The court order in *Fowler Packing* is attached as Exhibit 4.

20. I have applied similar methods to structure large amounts of unstructured data on behalf of defendants Verizon Wireless and Collecto in *Lofton v. Verizon* (Case No. 3:13-cv-05665) and *Lofton v. Collecto* (Case No. 4:13-cv-03293-YGR). In *Lofton v. Collecto*, I was ordered by the District Court of the Northern District of California to reconstruct a database from information that was in Verizon's possession that the plaintiff stated was "un-structurable" and

useless for purposes of analysis and determination of the results of calls that took place. I was able to complete the re-structuring of Verizon's data so that the parties could reach a successful settlement. The portion of the Court's Order from *Lofton v. Verizon* instructing me to create a database from Verizon's unstructured data is attached as Exhibit 5.

**Expertise Specifically Related to Outbound Dialing Systems in Call Centers.**

21. I have over twenty-five years of hands-on experience in telecommunications, in the design and programming of the equipment that handles calls. In specific, I was responsible for the development of specialized hardware and software systems, called Rapid Announce and Rapid Record that have been used in both telephone company central offices and in call centers, for the pacing, dialing, and measurement of phone calls, and has cumulatively handled hundreds of millions of calls. At its peak use, Rapid Announce processed 240,000 inbound and 280,000 outbound calls per day for companies such as First National Collection Bureau.

22. Rapid Announce was primarily used to match the pacing of outbound calls with the availability of agents to accept the calls once they were answered. Rapid Announce also evaluated the connected calls to determine whether the phone was answered by an answering machine or a live person. Based upon the availability of the agents and the type of call that was being placed, the system would then transfer the call to the correct type of agent, or skill-set group, to handle the particular circumstances for which the call was received, or dialed.

23. Rapid Record was responsible for handling the recording and media storage of inbound calls, as well as the implementation of a technology that I developed called AggravationSense. AggravationSense was designed to measure the cadence and speed at which an individual spoke. By measuring the cadence and speed of the speech against a baseline of background noise, AggravationSense would proactively patch in a customer service supervisor in advance of any party asking to speak with one.

**Materials and Documents Reviewed and Relied Upon.**

24. In conducting my analysis and preparing my conclusions and opinions, I relied upon the following materials and information:

`

**I. Materials that I relied upon in connection with my Declaration:**

(a) The Complaint (ECF 1); and,

(b) Calling Records:
*Call Record Report_CN Construction 1 (01749381xBE3E4).csv*
*Call Record Report_CN Construction 2 (01748644xBE3E4).csv*

**II. Electronic database resources that are available to me:**

(a) The National Exchange Carrier Association ("NECA") North American Numbering Plan 1000-block assignments database.

(b) External, publicly available databases, including iConectiv's WDNC[7,8] for use in identifying the type of line (and the carrier) and the Federal TCPA-eligible area code (and DNC) list that is published daily by the FTC[9].

**Methods and Tools Used to analyze Records.**

25. I create and analyze databases using Structured Query Language (SQL). A database is a computerized compilation of data organized into tables, each table having columns (attributes), with column headings, and rows of information. Tables that share at least one attribute in common are "related." Tables without a common attribute may still be related via other tables with which they do share a common attribute. The pathways relating those separate tables are called "joins." Once tables have been related by a join, a user may view the combined information in the joined tables to derive new and/or useful information. To access such

---

[7] FCC order FCC-15-35A1 (03/27/2015) explicitly mandated *continued* availability of iConectiv's data for purposes of compliance with the TCPA. (¶.142). The historical information *does not* contain subscriber information, only carrier of record and line type. Before number portability, this would have been a simple task of looking at the Local Exchange Routing Guide ("LERG"), or absent access to the LERG, finding the area codes and prefixes from an online collection of national phone books. TelSwitch, Inc. is a reseller and authorized user of iConectiv data.

[8] In *Perrong v Call Identified as Connor* (Case No. 1:22-cv-04479-CPO-EAP, DC, New Jersey, Camden Vicinage), "plaintiff has queried the database of iConectiv, the company charged by the Federal Communications Commission to administer the Number Portability Administration Center, which is the master database which lists which telephone provider services a particular number, among other information required to route telephone calls to the proper provider" (ECF 3)

[9] TelSwitch, Inc's FTC Organization ID is 10159990-70991, Subscription Account Number (SAN) 10376173-476173-21.

information, a user sends queries to the database, which executes the queries and retrieves the requested information from the tables in the database. A database, however, only recognizes queries written in complex "query languages." The most common query language is SQL. A proper query in this language consists of one or more "clauses." Common types of clauses are SELECT, WHERE, FROM, HAVING, ORDER BY, and GROUP BY clauses. Thus, to compose a proper inquiry, a user must understand the structure and content of the relational database as well as the syntax of the specific query language.

26. By using a set of standardized SQL queries, I am able to tag each call record according to (a) the date of a telephone call; and (b) the disposition of the call, if one is present; and (c) the length of the call; and (d) any other data field contained in the call records. I am also able to add (e) whether the number was on the Federal DNC list, and if so, when it was added; and (f) whether the number appears in any other file that was produced, such as on lead lists or summary sheets. Using SQL, I am able to also associate other information that is extrinsic to the worksheets provided that may provide additional guidance to the trier of fact, such as the name of the telephone company to which the number was serviced by on the date that the number was called.

**Steps I take when Organizing and Analyzing Call Records.**

27. I start by opening each of the files that contain call records data (collectively referred to as "Call Detail Records" or "CDRs"). I do this to (a) determine the format that the call records were stored in, and then (b) to determine what pre-processing I would need to conduct in order to achieve an import of the calls.[10]

28. I then import the CDRs file into SQL database tables using Microsoft SQL™ Service Management Studio to apply a set of filters to include only calls to valid telephone

[10] I typically do not need to apply any pre-process to the CDRs, as most CDRs originate from electronic call data capture systems that are already Electronic Data Interface ("EDI") capable.

numbers that were made that:

a. Were made to a number that contained precisely ten digits; and,

b. Were made to a number that started with a 2 through 9; and,

c. Were contained within structurable data[11]; and,

d. Had an associated date; and,

e. Indicated a duration equal to or greater than six (6) seconds, as identified by the field labeled *[call Time]* containing a six (6) or greater number of seconds[12]; and,

f. Were placed to area codes that were subject to the TCPA, according to the FTC (Exhibit 6); and,

g. Indicated that the number was on the national DNC list for more than thirty (30) days; and,

h. Whether a number called two (2) or more calls within 365 days.

29. I also prepared the framework for a set of data files that can be used to exchange with the telephone companies that can be used to identify the subscriber to the telephone number, based upon a well-defined format called an Electronic Data Interchange ("EDI") format, to query the telephone company databases in order to obtain the subscribership information.

**Telephone Companies databases maintain subscriber information and residential / business line classifications in electronic format as part of their standard record keeping.**

30. Wireless and wireline carriers maintain historical records that can be used to identify the residential or business classification for any particular phone number, as well as

[11] I conducted this to confirm that the calls were structurable and conformed to a normalized database layout specification in which data is aligned to the designated columns. (e.g. all data was contained in the columns allocated for that proper data type).

[12] The duration is determined by a telephone-company wide process known as "call supervision" by which the remote, or receiving party, sends electronic signals to indicate that a call has been answered by the receiving party.

contact information (Exhibit 7, properly redacted) As part of record-keeping requirements imposed upon them by the FCC, telephone companies must maintain those items for the reporting of residential and business line classifications, as well as being able to respond to subpoenas. They also use this information to route customer service calls to the correct residential or business service center,

31. The line type and customer information attributes are also maintained to support local-number-portability ("LNP") requests. In other words, when someone wishes to move their number from one carrier to another, they are required to provide certain requisite information, such a name and contact information, which must match then match the other carrier's records from where the number was being ported. These exchanges of port-in/port-out requests are handled electronically, and exchanged between and amongst the phone carriers[13] using a process called Electronic Data Interchange ("EDI") protocol. The EDI process encompasses a well-defined, regimented set of informational exchanges, and provides an efficient manner to handle, and route, port-in and port-out requests using a common set of data attributes.

32. I have become familiar with the manner in which telephone companies maintain these records to handle their own customer service and reporting requirements, as well as to provide support for the EDI protocol. Both in my role in providing billing and customer service software to phone companies, and in my role as a consulting expert for phone companies who are involved in litigation, I am familiar with the type of information that phone companies maintain on behalf of their customers.

33. As an example, I was the expert for Verizon Wireless in *Lofton v. Verizon Wireless*

---

[13] LNP includes both non-mobile and mobile carriers. Companies, regardless of the carrier type are required to support Local Number Portability ("LNP"). The National Portability Administration Center ("NPAC") is responsible for maintaining the database of the national numbering inventory, and as part of the FCC's order granting authority to iConnectiv to maintain this, they agreed to continue to make data available for TCPA compliance purposes. (FCC 15-35, ¶ 142).

*(VAW) LLC*, No. 13-cv-05665-YGR (N.D. Cal.). In the course of my work on that case, I came to understand that Verizon Wireless maintained records of which numbers were residential or business subscribers. In addition, I learned which types of information, which included line subscribership details that were maintained on a historical basis. Similarly, I am aware that other companies, such as AT&T Wireless and T-Mobile, maintain similar information for both compliance and customer support purposes. This information is also maintained so that calls for invoicing purposes can be rated and billed properly, and so that subpoenas can be properly responded to.

34. I also formerly ran a consumer telephone company, called Tel-One Network Services, which was similarly expected to maintain both business and residential information on subscribers' numbers, as well as contact information. Part of my responsibility at Tel-One Network Services was to interface with other telephone companies such as Pacific Bell (now AT&T) during the process of onboarding new subscribers, because we had to work with the proper business or residential department, depending upon the type of the product being offered.

**<u>Waterfall Analysis</u>. Steps that I applied to the Defendant's Data to conduct an analysis of the Call Detail Records to determine the unique number of calls, and the total number of calls that were placed to that number, where the number was on the national DNC list for more than thirty (30) days, and the called count quantity indicated that the number was called (2) or more times within 365 days.**

35. I started with the set of data that was provided, which included 1,462,396 calls within the source file listed in paragraph 24(I)(b). I started by removing 119,492 records that appeared that they were duplicative of another call in the production. I then removed twenty-one (21) calls that contained telephone numbers that were associated with the FTC's index of TCPA-eligible area codes. This resulted in 1,342,883 remaining calls.

36. I then removed 443,773 calls that contained duration of less than six seconds in the field labeled *[call time]*. I then applied an additional filter to remove 289,629 records that indicated calls to that number that were either (a) not on the national DNC list, or (b) were on the national DNC list, but was not on the National DNC list for

more than thirty (30) days from the most recent call date field. I then removed 60,155 records where my *is2orMore365* field indicated less than two (2) calls were made to that number within 365 days.

| | |
|---|---|
| All items within "Defendant Call Records" files [callLogs]: | 1,462,396 |
| Removal of any records that do not contain a telephone number: | - |
| Removal of any apparent duplicate call records (e.g. Removal of any records from the remaining call detail records ("CDR") where the call was recorded duplicatively. | (119,492) |
| Removal of any number that was not part of the FTC's list of valid TCPA-eligible north american numbering plan destination area codes, or records indicating a telephone number that was not ten digits, or the record did not have a properly formatted date/time. | (21) |
| Removal of any calls that were less than six seconds in duration. | (443,773) |
| Removal of any calls from the list where the number to which the calls were placed to numbers that were (a) not on the DNC list, or (b) were on the DNC list but the calls were made before the number had been on the DNC list for more than thirty (30) days. | (289,629) |
| Removal of any calls from the list where the number to which the calls were placed to numbers that were on the NDNC list for more than thirty days, but there were not two (2) or more calls to that # within 365 days. | (60,155) |
| Quantity of unique numbers to which the **549,326** calls were sent, where the # was on the DNC list for more than thirty days and there were two (2) or more calls within 365 days, which includes nine (**9**) calls to the Named Plaintiff's number ending in **-3200**. | 127,072 |

37. I was able to determine that there were 549,326 calls that were placed to 127,072 unique numbers, where the number to which the call was placed had been on the national DNC list for more than thirty (30) days, and the number had received two or more calls within 365 days, including nine (9) calls to the named plaintiff's number ending in -3200.

| | Date / Time | Client ID | Client | Gateway | Platform IP | DID | Lead | Call Seconds | S/S |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Apr 7, 2025, 1:04:00?PM | 26900 | C&N Construction | CNConstruction.readymode.com | 184.154.13.18 | 6305761803 | 3200 | 192 | A |
| 2 | Mar 21, 2025, 12:13:28?PM | 26900 | C&N Construction | CNConstruction.readymode.com | 184.154.13.18 | 6305761805 | 3200 | 12 | A |
| 3 | Mar 12, 2025, 12:00:35?PM | 26900 | C&N Construction | CNConstruction.readymode.com | 184.154.13.18 | 6305761803 | 3200 | 12 | A |
| 4 | Apr 17, 2025, 11:54:19?AM | 26900 | C&N Construction | CNConstruction.readymode.com | 65.60.20.34 | 6305761808 | 3200 | 18 | A |
| 5 | Apr 11, 2025, 10:40:41?AM | 26900 | C&N Construction | CNConstruction.readymode.com | 184.154.13.18 | 6305761802 | 3200 | 174 | A |
| 6 | Mar 18, 2025, 10:32:56?AM | 26900 | C&N Construction | CNConstruction.readymode.com | 184.154.13.18 | 6305761803 | 3200 | 12 | A |
| 7 | Jul 29, 2024, 9:30:37?AM | 26900 | C&N Construction | CNConstruction.readymode.com | 65.60.36.158 | 6305761806 | 3200 | 66 | A |
| 8 | Mar 25, 2025, 11:18:14?AM | 26900 | C&N Construction | CNConstruction.readymode.com | 184.154.13.18 | 6305761808 | 3200 | 12 | A |
| 9 | Mar 27, 2025, 10:10:57?AM | 26900 | C&N Construction | CNConstruction.readymode.com | 184.154.13.18 | 6305761810 | 3200 | 192 | A |

38. Attached as Exhibit 8 are the SQL queries that I ran to conduct my analysis. Exhibit 9 contains a summary of the results of the analysis related to the waterfall.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 26th day of September, 2025 in Pleasant Hill, California.



Aaron Woolfson

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**GEORGE MOORE**, individually and on behalf of a class of all persons and entities similarly situated,

*Plaintiffs*,

v.

**C&N CONSTRUCTION, INC.**

*Defendant*.

Case No. 1:25-cv-04568

Presiding: **Hon. Andrea Wood**

**ERRATA TO THE SUPPLEMENTAL EXPERT DECLARATION OF AARON WOOLFSON**

I, Aaron Woolfson, state and declare as follows:

1. I have been retained by Plaintiff's counsel to provide structure to, and then analyze, the electronic Call Detail Records ("CDR" or "CDRs"), customer lists, and other associated information that has been, or will be, provided in this lawsuit reflecting the calling done by C&N Construction, Inc. ("C&N Construction" or "C&N" or "Defendant").

2. I have previously proffered two declarations in this matter, as well as having sat for a deposition on June 29, 2026:

(a) On September 25, 2025, I outlined a methodology, called a waterfall analysis, that could be used to identify the quantity of text messages contained within call detail records ("CDRs") that were sent to telephone numbers that were on the national Do Not Call ("DNC") list for more than thirty (30) days, and of those, which were sent at two (2) or more text messages within a twelve (12) month period.

(b) On June 17, 2026, I applied an additional step to remove those individuals to whom calls had been made who allegedly had pre-existing relationships with the Defendant.

3. Based upon the analysis that I had described within my September 25, 2025 report, I had identified that there had been 549,326 calls that were placed to 127,072 unique numbers,

where the number to which the call was placed had been on the national DNC list for more than thirty (30) days, and the number had received two or more calls within 365 days, including nine (9) calls to the named plaintiff's number ending in -3200, of which 532,910 calls that had been placed to 110,656 distinct telephone numbers where there had been two (2) or more calls within 365 days.

4. Then, on June 17, 2026, I was asked to remove any call that had been placed to the individuals indicated within the file labeled "*Supp Rog 1 Set 2 - Confidential.xls*", which contained 1,135 distinct telephone numbers. As a result of the reduction, I was able to remove an additional 4,176 calls, resulting in a total of 545,150 telephone calls to 125,937 distinct telephone numbers.

5. At my deposition, I noticed that the final copy of my reports had not rendered properly to PDF, resulting in the final paragraph having been omitted, where I had removed any calls contained within the 545,150 telephone calls to 125,937 unique numbers to which there had been only one (1) call had been placed to that number within 365 days.

6. I brought this up on the deposition, indicating that the final quantity of call counts should be 16,295 less than that which was indicated on paragraph 9 of the PDF version of my June 17, 2026 report, and that the final result should be 528,855 telephone calls to 109,642 distinct telephone numbers.[1]

> 10. Finally, by removing from the 545,150 telephone calls to 125,937 distinct telephone numbers any number that had not been called two (2) or more times within 365 days while on the national DNC for more than thirty (30) days, I was able to determine that there had been 528,855 telephone calls that had been placed to 109,642 distinct telephone numbers where there had been two (2) or more calls to those numbers within 365 days, which includes nine (9) calls to the named plaintiff's number ending in -3200.

[1] No new work product, nor analysis, was conducted related in preparation for this errata.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 1st day of July 2026 in Pleasant Hill, California.

Aaron Woolfson